# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 14, 2013      Decided August 5, 2014

No. 10-5059

JEREMY PINSON, ET AL.,
APPELLANTS

v.

CHARLES E. SAMUELS, JR., ET AL.,
APPELLEES

On Petition for Writ of Mandamus
(No. 1:10-cv-00092)

*Dawn E. Murphy-Johnson*, appointed by the court, argued the cause as *amicus curiae* for appellants. With her on the briefs was *Anthony F. Shelley*, appointed by the court.

*Wynne P. Kelly*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GARLAND, *Chief Judge*, and HENDERSON and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*:   Jeremy Pinson is a federal prisoner serving a twenty-year sentence for threatening the President, knowingly and willfully making a false statement to a United States Marshal, and mailing threatening communications.  Pinson has made frequent use of the federal courts during his time in prison, having filed more than 100 civil actions and appeals across the nation.  In this case, filed in the District of Columbia, Pinson challenges the conditions of his confinement at the Federal Correctional Institution in Talladega, Alabama.   The district court determined that venue in the District of Columbia was improper and ordered the action transferred to the Northern District of Alabama.  Pinson then filed a mandamus petition in this court seeking to vacate the district court's transfer order, and also to compel the district court clerk to accept certain rejected filings.   Four fellow prisoners join his petition, and all of them seek to proceed *in forma pauperis* in this court.  Pinson and one other petitioner also moved to stay collection of the filing fees, arguing that the federal *in forma pauperis* statute entitles them to defer the payment of fees in this case until they complete their payment of fees owed in other cases.

Because Pinson has run afoul of the Prison Litigation Reform Act's three-strikes provision and has failed to demonstrate that he qualifies for the imminent danger exception, we deny his motion to proceed *in forma pauperis*.  We also hold that the remaining petitioners lack standing to challenge either the transfer order or the clerk's rejection of the filings.  Finally, we deny the motion to stay the collection of filing fees pending the payment of fees in other cases.

## I.

In December 2009, Pinson filed a complaint in the United States District Court for the District of Columbia, naming

several Bureau of Prisons (BOP) officials as defendants. At the time, he was incarcerated in the Special Management Unit (SMU) of the Federal Correctional Institution in Talladega. SMUs house gang-affiliated and other disruptive inmates who present unique security concerns. *See* BOP Program Statement 5217.01 (Nov. 19, 2008). Pinson's complaint alleged that SMUs are "unconstitutionally violent and dangerous" in violation of the Eighth Amendment. App. 9. He claimed that his designation to an SMU placed him "in imminent danger" because BOP officials failed to identify him as a former associate of a gang and to separate him from members of rival gangs. App. 8-9. He further alleged that the defendants knew that he was a homosexual who thus would "face[] a substantial risk of harm" if designated to an SMU. App. 8. Pinson moved to proceed *in forma pauperis* (IFP) pursuant to 28 U.S.C. § 1915.

In January 2010, the district court issued an order transferring Pinson's case to the Northern District of Alabama. The court determined that venue did not properly lie in the District of Columbia "[b]ecause none of the alleged events forming the basis of the complaint occurred in the District." Transfer Order, ECF No. 3, App. 21. The court stated that Pinson's IFP application would be decided by the transferee court. *Id.*

In March 2010, after unsuccessfully moving for reconsideration of the transfer order, Pinson filed a notice of appeal. This court construed the notice as a petition for a writ of mandamus, and ordered Pinson to pay the $450 docketing fee or to file a motion to proceed IFP. Pinson moved to proceed IFP, as well as to stay any collection of filing fees until he completed payment of filing fees owed in other cases he had brought.

4

Pinson, joined by several fellow SMU inmates, then submitted a "Motion for Joinder of Appellees and for Appointment of Counsel." According to that motion, the other inmates had attempted to join Pinson's lawsuit by filing a "Motion for Joinder" in the district court. The prisoners claimed to have submitted the Motion for Joinder twice, once prior to the transfer of the case and once as an accompaniment to Pinson's motion for reconsideration of the transfer order. The prisoners argued that the district court clerk exceeded his authority by allegedly returning the motion unfiled on both occasions. They also submitted an amended notice of appeal clarifying their intention to challenge both the transfer order and the clerk's rejection of the Motion for Joinder. This court construed the amended notice of appeal to be a supplement to the mandamus petition.

Over the next several years, the parties engaged in an extended back-and-forth concerning Pinson's eligibility for IFP status and his motion to stay the collection of filing fees. A motions panel of this court dismissed all the prisoners attempting to join the case (for failure to prosecute) except Andrew Hobbs and Jeremy Brown, both of whom were granted IFP status. The panel also appointed an amicus curiae to present arguments in favor of the petitioners. Another motions panel later reinstated two of the previously dismissed prisoners, Antoine Bruce and John Leigh, as petitioners, and ordered them to file completed motions for leave to proceed IFP. Bruce also joined Pinson's motion to stay the collection of filing fees.

II.

We first consider Pinson's request to proceed IFP before this Court, which we deny. The federal IFP statute, codified at 28 U.S.C. § 1915, generally authorizes courts to waive ordinary filing fees for an indigent litigant seeking to bring a lawsuit. *See*

28 U.S.C. § 1915(a)(1). In 1996, prompted by widespread concerns that inmates had been flooding the courts with meritless claims, Congress enacted the Prison Litigation Reform Act (PLRA). *See Chandler v. D.C. Dep't of Corr.*, 145 F.3d 1355, 1356 (D.C. Cir. 1998). The PLRA substantially amended 28 U.S.C. § 1915 with regard to prisoner-litigants. Unlike other litigants, prisoners accorded IFP status can no longer avoid payment of filing fees altogether. They instead are permitted to pay in monthly installments rather than in one, up-front payment. 28 U.S.C. § 1915(b).

Additionally, prisoners who have incurred three or more "strikes" face a potential bar against proceeding IFP:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section [authorizing IFP proceedings] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C § 1915(g). Because it is undisputed that Pinson has accumulated at least three strikes, the statute prohibits him from proceeding IFP unless he falls within the imminent danger exception.

In assessing imminent danger, we examine the conditions faced by Pinson at the time he initiated his action. Both sides urge us to broaden the inquiry to encompass later developments. Amicus points to the August 2010 murder of another SMU inmate (who was an attempted co-petitioner), as well as an

alleged January 2011 incident in which Pinson was nearly stabbed. The government, for its part, contends that Pinson's relocation to an Administrative Maximum facility in Florence, Colorado, renders moot his claim of imminent danger concerning his confinement in the Talladega SMU. We reject the invitation to take into account those subsequent events.

Our decision in *Mitchell v. Federal Bureau of Prisons*, 587 F.3d 415 (D.C. Cir. 2009), precludes consideration of post-complaint developments when assessing the applicability of the imminent danger exception. We explained there that "we assess the alleged danger at the time [the prisoner] filed his complaint and thus look only to the documents attesting to the facts at that time, namely his complaint and the accompanying motion for IFP status." *Id.* at 420. That approach squares with the statute's temporal reference point: the initial act of "bring[ing]" a lawsuit. 28 U.S.C. § 1915(g); *see Andrews v. Cervantes*, 493 F.3d 1047, 1052-53 (9th Cir. 2007). Section 1915(g) directs attention to whether the prisoner "is under imminent danger of serious physical injury" when he "bring[s]" his action, not to whether he later in fact suffers (or does not suffer) a serious physical injury.

The provision's status as a mere "screening device" reinforces that understanding. *Andrews*, 493 F.3d at 1050, 1055. Otherwise, the inquiry into imminent dangerousness could require examining myriad post-filing developments and adjustments of confinement conditions that may transpire during the course of a lawsuit (and that often attend an inmate's imprisonment). Restricting the inquiry to the allegations in a prisoner's complaint better coheres with § 1915(g)'s "limited office." *Id.* at 1055.

Turning, then, to the allegations in Pinson's complaint (and his accompanying motion for IFP status), his claim of imminent danger closely resembles one we rejected in *Mitchell*.

Mitchell's complaint alleged that "even though BOP knew he had testified for the government, it illegally transferred him to USP Florence, a prison known for murders and assaults on . . . anyone who has been known as a snitch, and where he was nearly murdered." 587 F.3d at 420-21 (ellipsis in original) (internal quotation marks omitted). This court found that Mitchell had "failed to allege that the danger he faces is imminent." *Id.* at 421. With respect to the alleged attack against Mitchell, the court noted that he had "wait[ed] until seventeen months after the . . . attack to file his complaint." *Id.* With respect to his general allegation that the facility was known to present dangers to inmates who testify for the government, the court concluded that "neither the complaint nor his IFP motion alleges any ongoing threat." *Id.*

Pinson's allegations of imminent danger are materially indistinguishable from those found inadequate in *Mitchell.* Pinson contends that, as a homosexual and former gang member, his designation to the Talladega SMU alongside members of rival gangs placed him in imminent danger of death or serious bodily injury. Like Mitchell, Pinson's claim rests on the BOP's decision to designate him to a particular facility notwithstanding its reputation as a dangerous place for inmates possessing certain characteristics—here, as a rival gang-member and homosexual, and in *Mitchell*, as a government "snitch." The *Mitchell* court found such contentions insufficient to satisfy the imminent danger exception, even though Mitchell, unlike Pinson, further alleged that he had already been attacked by the time he filed his complaint. We see no ground for reaching a different conclusion here.

Because Pinson fails to qualify for the imminent danger exception to the three-strikes rule, we deny his motion for IFP status. If he wishes to proceed, he has thirty days from the date of this opinion to pay the filing fee up front. *See Mitchell*, 587

F.3d at 422. If he elects not to proceed, no fees will be collected. *See Smith v. District of Columbia*, 182 F.3d 25, 30 (D.C. Cir. 1999). Pinson's co-petitioners, by contrast, have not accumulated three strikes. This court already granted IFP status to Hobbs and Brown, and we now grant IFP status to Bruce and Leigh. We therefore proceed to consider the mandamus petition with regard to those four petitioners.

III.

The mandamus petition challenges both the district court clerk's refusal to docket a "Motion for Joinder" and the district court's transfer of the case to the Northern District of Alabama. We conclude that the remaining petitioners lack standing to raise either of those claims.

To establish Article III standing, a plaintiff must demonstrate that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Here, moreover, petitioners seek mandamus relief, a "drastic" remedy "invoked only in extraordinary situations." *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976).

9

Petitioners contend that the district court clerk twice refused to file a "Motion for Joinder" which they had submitted in an attempt to join the action below. While petitioners aver in their pleading that they were injured as a result of the clerk's alleged actions, they provide no evidence that the Motion for Joinder in fact existed, let alone that it was submitted to the district court. The record contains no reference to any such motion despite petitioners' contention that it was twice returned to Pinson stamped "received." Nor do petitioners give any explanation for the absence of any reference to the motion in the record. In those circumstances, petitioners fail to support their claim of injury "with the manner and degree of evidence required" for mandamus relief. *Lujan*, 504 U.S. at 561; *see Sierra Club v. EPA*, 292 F.3d 895, 898-902 (D.C. Cir. 2002).

Petitioners also lack standing to challenge the transfer of Pinson's complaint to the Northern District of Alabama. Petitioners were not parties to the suit below, and "non-parties usually lack standing to challenge venue dispositions." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 116 (2d Cir. 1992); *see also United States v. U.S. Dist. Court, S. Dist. of Tex.*, 506 F.2d 383, 384 (5th Cir. 1974) (nonparty lacked standing to compel transfer of venue via mandamus). We have no occasion to assess whether our conclusion might be different if petitioners had substantiated their allegations that they attempted to join the suit below and had demonstrated that the district court improperly denied their request. *Cf. Alt. Research & Dev. Found. v. Veneman*, 262 F.3d 406, 411 (D.C. Cir. 2001) (per curiam) (suggesting that non-party might have standing to appeal a stipulated dismissal where intervention is improperly denied).

Amicus argues that petitioners can establish standing based on their general interest in the lawsuit, citing *Aurelius Capital Partners v. Republic of Argentina*, 584 F.3d 120 (2d Cir. 2009).

In *Aurelius Capital*, the Second Circuit determined that a nonparty with an "interest affected by the district court's judgment" had standing to appeal the judgment. *Id.* at 127-29. But the nonparty in *Aurelius Capital* had a direct property interest in certain funds deemed subject to attachment and execution by the lower court's order. *Id.* at 128. Even if that sort of direct property interest would justify non-party standing, petitioners' generalized "interest in the lawsuit challenging SMU procedures" does not suffice. Amicus Br. 38.

IV.

The remaining issue concerns the manner in which filing fees should be collected from petitioner Bruce. Under the federal IFP statute as amended by the PLRA, prisoners granted IFP status must make an initial partial payment at the time of filing followed by monthly installments until they pay the full fees. Section 1915(b) sets out the payment structure as follows:

> (b)(1) Notwithstanding subsection (a) [which encompasses non-prisoner litigants], if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of—
>
>> (A) the average monthly deposits to the prisoner's account; or
>>
>> (B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

(2) After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

Pinson moved to stay the collection of the monthly installments due in this case until he fulfilled his obligation to pay the filing fees he owed in other cases. That issue is moot as to Pinson in light of our conclusion that he may not proceed IFP. But we must still decide the issue on behalf of Bruce, who joined Pinson's motion and to whom we have granted IFP status. *See supra* Part II.

The courts of appeals are divided concerning the manner in which the PLRA calls for collection of installment payments from prisoners who simultaneously owe filing fees in multiple cases. The Second and Fourth Circuits interpret § 1915(b) to cap the monthly exaction of fees at twenty percent of a prisoner's monthly income, regardless of the number of cases for which he owes filing fees. *Torres v. O'Quinn*, 612 F.3d 237, 252 (4th Cir. 2010); *Whitfield v. Scully*, 241 F.3d 264, 277 (2d Cir. 2001). Under that "per prisoner" cap, a prisoner would satisfy his obligations sequentially, first fully satisfying his obligation for his earliest case before moving on to the next one, at no time making any payment that would take his cumulative payments for that month beyond an overarching twenty-percent ceiling. By contrast, the Fifth, Seventh, Eighth, and Tenth Circuits have held that § 1915(b) requires a prisoner to make a separate installment payment for *each* filing fee incurred as long as no *individual* payment exceeds twenty percent of his monthly income. *Christensen v. Big Horn Cnty. Bd. of Cnty. Comm'rs*,

374 F. App'x 821, 833 (10th Cir. 2010); *Atchison v. Collins*, 288 F.3d 177, 180 (5th Cir. 2002); *Lefkowitz v. Citi-Equity Grp.*, 146 F.3d 609, 612 (8th Cir. 1998); *Newlin v. Helman*, 123 F.3d 429, 436 (7th Cir. 1997), *overruled in part on other grounds by Lee v. Clinton*, 209 F.3d 1025 (7th Cir. 2000), *and Walker v. O'Brien*, 216 F.3d 626 (7th Cir. 2000). Under that "per case" cap, a prisoner simultaneously makes payments towards satisfaction of all of his existing obligations.

This court, contrary to amicus's contention, has yet to choose between those approaches. Amicus errs in reading *Tucker v. Branker*, 142 F.3d 1294 (D.C. Cir. 1998), to have adopted a per prisoner cap. In that case, a North Carolina inmate challenged the PLRA's filing fee requirement, arguing that it denied him "due process of law by forcing him to choose between filing a lawsuit and being able to buy the necessities of life." *Id.* at 1298. In rejecting Tucker's challenge, we observed that "the payment requirement of the PLRA never exacts more than 20% of an indigent prisoner's assets or income." *Id.* That statement did not adopt a per-prisoner cap. *Tucker* involved an as-applied challenge to the PLRA by a prisoner who had filed one suit and thus owed a single twenty-percent installment each month. *Id*. Unsurprisingly, the decision at no point mentions or contemplates the possibility of multiple simultaneous suits. In context, the observation relied on by amicus is best read to explain that the PLRA's payment structure "never exacts more than 20%" of a prisoner's monthly income for a given suit. *See id.* at 1297-98. And insofar as the statement could be understood to speak to a multiple-suit scenario not presented by the case, it would constitute non-binding dicta. *See Torres*, 612 F.3d at 242 n.3 (referring to the statement from *Tucker* as dicta).

Considering the issue afresh, we conclude that the per-case approach adopted by the Fifth, Seventh, Eighth, and Tenth Circuits is the better understanding of the statute. We begin

with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). Taken as a whole, the language and operation of § 1915 indicate that its provisions apply *to each action or appeal* filed by a prisoner; and subsection (b)(2), governing the payment of fees in installments, is no exception. *See Torres*, 612 F.3d at 256 (Niemeyer, J., dissenting).

Subsection (b)(1) of § 1915 addresses the threshold obligation to make an initial partial payment. The provision instructs that, "if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall . . . collect, as a partial payment of any court fees required by law, an initial partial filing fee . . . ." 28 U.S.C. § 1915(b)(1). The plain text of the provision calls for assessment of the initial partial filing fee *each time* a prisoner "brings a civil action or files an appeal." *Id.* Amicus acknowledges that the initial partial filing fee accrues in each case, regardless of the number of suits initiated.

Subsection (b)(2), the immediately ensuing provision, then states that, "*[a]fter payment of the initial partial filing fee*, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income." 28 U.S.C. § 1915(b)(2) (emphasis added). Because the initial partial filing fee imposed in subsection (b)(1) acts as the "triggering condition" for the monthly installments required by subsection (b)(2), the two provisions should be read in tandem. *Torres*, 612 F.3d at 256 (Niemeyer, J., dissenting). Given that the initial fee required by subsection (b)(1) applies on a per-case basis, it follows that subsection (b)(2)'s monthly payment obligation likewise applies on a per-case basis. *See id.* at 256-57.

The remainder of 28 U.S.C. § 1915 fortifies that per-case understanding. Subsection (a)(2), for example, states that a "prisoner seeking to bring *a civil action or appeal a judgment* in a civil action or proceeding without prepayment of fees or security therefor . . . shall submit a . . . trust fund account statement . . . for the 6-month period immediately preceding the filing of the complaint or the notice of appeal." *Id.* § 1915(a)(2) (emphasis added). Subsection (e)(2) provides that, "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss *the case* at any time if the court determines that" the case is defective. *Id.* § 1915(e)(2) (emphasis added). Subsection (f)(1) allows a court to render judgment for costs "at the conclusion of *the suit or action*." *Id.* § 1915(f)(1) (emphasis added). Interpreting subsection (b)(2) to dictate the amount a prisoner may be required to pay each month for all his cases *in toto* would be incongruous with the rest of the statute.

Amicus responds that § 1915(b)(1) terms the initial partial filing fee payment a "payment of *any* court fees required by law." And because "any" means "any and all," amicus contends, § 1915(b)(2) contemplates taking no more than twenty percent from an inmate's monthly income as payment for "all" court fees owed in all cases. Subsection (b)(1)'s reference to "any" court fees, however, must be read in context: when a prisoner "brings a civil action or files an appeal," he must pay an initial filing fee and monthly installments thereafter as payment of any (and all) court fees *required for that action or appeal*. *Id.* § 1915(b)(1); *see Torres*, 612 F.3d at 258 (Niemeyer, J., dissenting). A straightforward reading of § 1915 thus indicates that both the initial payment required by subsection (b)(1) and the monthly installments required by subsection (b)(2) apply on a per-case basis. Nothing in the statute suggests that a second or third action should be treated any differently than the first.

Amicus urges us to adopt the per-prisoner approach to avoid unconstitutionally constraining a prisoner's access to the courts. But the PLRA's safety-valve provision, § 1915(b)(4), separately serves that function. Under that provision, "[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee." Moreover, § 1915(b)(2) calls for collection of the required monthly installments only if the amount in a prisoner's account exceeds $10. As a result, even if 100 percent of a prisoner's income were subject to recoupment for filing fees, the statute assures his ability to initiate an action (provided of course that he faces no bar against proceeding IFP altogether by virtue of having accumulated three strikes). And because prison officials are constitutionally required to afford inmates "'adequate food, clothing, shelter, and medical care,'" our adoption of the per-case approach will not force a prisoner "to choose between the necessities of life and his lawsuit." *Tucker*, 142 F.3d at 1298 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Finally, the per-case approach comports with the PLRA's basic object. The "PLRA was designed to deter prisoners from filing frivolous lawsuits, which waste judicial resources and compromise the quality of justice enjoyed by the law-abiding population." *In re Kissi*, 652 F.3d 39, 41 (D.C. Cir. 2011) (per curiam) (internal quotation marks omitted). Capping monthly withdrawals at twenty percent of an inmate's income, regardless of the number of suits filed, would diminish the deterrent effect of the PLRA once a prisoner files his first action. *See Newlin*, 123 F.3d at 436. And although some of the legislative history cited by amicus suggests a disinclination to impose excessive fees on a prisoner for filing a lawsuit, there is no indication of an intention to refrain from imposing the same, non-excessive payment structure each time a prisoner initiates an action. *See, e.g.*, 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement

of S. Kyl) ("The filing fee is small enough not to deter a prisoner with a meritorious claim, yet large enough to deter frivolous claims and multiple filings.").

\* \* \* \* \*

For the foregoing reasons, we deny Pinson's motion to proceed IFP and Bruce's motion to stay collection of fees. We also dismiss the mandamus petition with respect to the allegedly rejected filings. With respect to the challenge to the transfer order, Pinson has thirty days from the issuance of this opinion to pay the filing fee and proceed. The other petitioners, although permitted to proceed IFP, lack standing to challenge the transfer. The clerk's office therefore should collect the applicable fees from each petitioner in accordance with § 1915(b).

*So ordered.*