# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 13, 2024        Decided October 18, 2024

No. 22-5251

MICHAEL S. OWLFEATHER-GORBEY, A/K/A TSUNAMI KHAN,
APPELLANT

v.

AVERY, CAPT, USP THOMPSON, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-02193)

*Sonia Geba*, Student Counsel, argued the cause as *amicus curiae* in support of appellant. With her on the briefs were *Erica Hashimoto*, Director, and *Eva Shell*, Supervisory Attorney, both appointed by the court, and *Alexis R. Casanas*, Student Counsel.

*Michael S. Owlfeather-Gorbey*, *pro se*, was on the briefs for appellant.

*Douglas C. Dreier*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Brian P. Hudak* and *Jane M. Lyons*, Assistant U.S. Attorneys. *Kartik N. Venguswamy*, Assistant U.S. Attorney, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, WILKINS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WALKER.

WILKINS, *Circuit Judge:*

This is another suit brought by Michael Gorbey who is currently serving a twenty-two year sentence in federal prison. *Gorbey v. United States*, 55 F. Supp. 3d 98, 101 (D.D.C. 2014). Following his sentencing in 2008, Mr. Gorbey quickly distinguished himself as "a prolific litigator, filing scores of suits across the country." *Pinson v. Dep't of Just.*, 964 F.3d 65, 72 (D.C. Cir. 2020) ("*Pinson II*"); *see also Gorbey*, 55 F. Supp. 3d at 101. The allegations in this suit, like many of his others, relate to Mr. Gorbey's dissatisfaction with the conditions in a prison where he is incarcerated.

As a general rule, litigation is not cheap. But for a short time, Mr. Gorbey, as a federal prisoner, was able to proceed *in forma pauperis* ("IFP") and file his claims without paying the full filing costs up front under the Prison Litigation Reform Act ("PLRA"). *See* 28 U.S.C. § 1915. Mr. Gorbey's days of paying for filings in installments ended after three of his cases were dismissed as "frivolous, malicious, or [for] fail[ure] to state a claim." 28 U.S.C. § 1915(g). Now, Mr. Gorbey must pay his filing fees in full before bringing any case in federal court unless he can show that he "is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g) ("the three-strikes exemption"). Here, we consider another one of Mr.

Gorbey's attempts to proceed IFP under the three-strikes exemption.

Before the District Court, and before us too, Mr. Gorbey alleges that he is under imminent danger of serious physical injury because prison officials have both repeatedly denied him necessary medical treatments for his worsening glaucoma that threatens blindness and instructed other prisoners to physically assault him. The District Court rejected Mr. Gorbey's allegations that he is under an imminent danger of serious physical injury, denied his motion to proceed IFP, and dismissed his case without prejudice.

We disagree with the District Court that Mr. Gorbey's worsening glaucoma has not placed him under an imminent danger of serious physical injury. Therefore, we grant Mr. Gorbey's motion to proceed IFP here, and reverse the District Court's denial of Mr. Gorbey's motion to proceed IFP so that his complaint may be docketed.

But we also recognize that Mr. Gorbey's complaint includes frivolous allegations against the United States Attorney General, the Director of the Administrative Office of Federal Courts, and the United States Senate Judiciary Committee Members. And because the PLRA mandates immediate dismissal of claims that are "frivolous," we dismiss the claims against the aforementioned defendants. 28 U.S.C. § 1915A(b)(1).

**I.**
**A.**

The District Court rejected Mr. Gorbey's motion to proceed IFP without hearing from the government. Mr. Gorbey then appealed, and we ordered him to show cause regarding the nonpayment of his filing fee. Given the short

time frame between the District Court's dismissal, Mr. Gorbey's appeal, and our order to show cause, the allegations in all of Mr. Gorbey's filings are consistent. Thus, we look to the allegations in both, Mr. Gorbey's complaint and in his response to the order to show cause, when evaluating his motion to proceed IFP before our Court and whether the District Court erred in denying his motion to proceed IFP.

Mr. Gorbey alleges that soon after he was transferred to USP Thompson, in April 2022, prison officials were aware of his litigious past and that he was at risk of losing his eyesight because of rapidly worsening glaucoma. Mr. Gorbey's glaucoma, and the risks that it poses to his physical health, are well-supported through multiple exhibits that he includes in the record. *See* J.A. 70–84. In fact, one doctor feared that Mr. Gorbey "is at high risk for developing a condition known as 'Snuff-out' syndrome," which makes eye surgery a serious risk as it could "accelerat[e] the eventual outcome of blindness." J.A. 72. Given the state of his glaucoma, Mr. Gorbey believes that he now needs medical marijuana. J.A. 75.

Generally, Mr. Gorbey alleges that USP Thompson prison officials began to target him because they were aware of his litigious past. And one way that USP Thompson officials targeted him was to deny "his prescribed glaucoma" medicine. J.A. 10. These denials, which Mr. Gorbey alleges began the moment he arrived at USP Thompson, were consistent with an alleged threat made by Captain Avery who visited Mr. Gorbey's cell to specifically notify him that he was "in for a ride" because of his past lawsuits. J.A. 11.

In response to these early incidents (Captain Avery's threats and general denials of needed glaucoma treatments), Mr. Gorbey filed an informal complaint. J.A. 11. This informal complaint only made things worse. Mr. Gorbey

alleges that, after he filed the complaint, he was again threatened by another prison official. J.A. 11.

Mr. Gorbey further alleges, in great detail, that USP Thompson officials intentionally contributed to his worsening glaucoma as a form of retaliation. He specifically alleges that USP Thompson officials "continuously" failed to refill his medicine, J.A. 41, 116–17, on one occasion, contaminated his eye drops with pepper spray, J.A. 14, and generally did not allow him to see an ophthalmologist even though prison officials were well-aware of his rapidly worsening condition, J.A. 40. Mr. Gorbey further alleges that when USP Thompson officials finally scheduled an ophthalmologist appointment, on September 1, 2022, he was actually sent to an optometrist. J.A. 40–41, 124. At this ophthalmologist-turned-optometrist visit, Mr. Gorbey asserts that he received only electronic eye scans, which were inadequate given the rapidly worsening state of his glaucoma.

Mr. Gorbey's filings also include allegations that USP Thompson officials compounded his medical problems by responding violently to his complaints that he needed better treatments. Specifically, Mr. Gorbey alleges that prison officials instructed a few of USP Thompson's most violent inmates to attack him, and guaranteed that such attacks would occur by housing him with the prisoners who were most likely to heed the guard's instructions to harm. *See generally* J.A. 14–16, 35, 37–39, 58. After those inmates attacked and seriously injured him, Mr. Gorbey asserts that prison officials failed to adequately tend to these injuries. *See generally* J.A. 17–18, 43–45, 64, 114, 123–24, 128.

Although the District Court rejected Mr. Gorbey's motion without hearing from the government, we ordered the

government to reply to the allegations that Mr. Gorbey provided in his response to our order to show cause.

While the government acknowledges that Mr. Gorbey is at serious risk of acquiring blindness, it contends that Mr. Gorbey does not qualify under the three-strikes exemption because his worsening glaucoma is not related to his suit that arises under *Bivens* and the Federal Tort Claims Act. That is because, in the government's view, the only treatment that Mr. Gorbey will accept is medical marijuana. In support of this argument, the government provides three offerings: (1) Mr. Gorbey's filings; (2) an affidavit filed by Timothy Moisant, the Heath Services Administrator at USP Thompson, who avers that Mr. Gorbey has twice rejected eye surgery, J.A. 104; and (3) a court decision from almost five years ago that noted that Mr. Gorbey declined "the surgical procedure that a glaucoma specialist [had] determined [was] necessary to prevent the disease from causing him to lose his eyesight." *See Gorbey v. Mubarek*, No. RDB-19-220, 2019 WL 5593284 at *5 (D. Md. Oct. 30, 2019).

The government also disputes Mr. Gorbey's allegation that he has not seen an ophthalmologist since his transfer to USP Thompson; Mr. Moisant avers that Mr. Gorbey's September 1, 2022, appointment was "an external ophthalmology consult, which included detailed testing, imaging, and scans of his eyes, updates to his diagnosis, and a review of his medications." J.A. 103.

Additionally, the government contends that Mr. Gorbey's allegations that USP Thompson officials coordinated retaliatory prison assaults are insufficient to demonstrate an imminent danger of serious physical injury. Broadly, the government argues that only three of the alleged assaults are relevant—and as a matter of law, three assaults do not place a prisoner under an imminent danger of serious physical injury.

More narrowly, the government argues that the two inmates who are alleged to have assaulted Mr. Gorbey do not pose an imminent threat of serious physical injury. That is because, at the time his appeal was noticed, Mr. Gorbey was no longer forced to live with either alleged assailant. And as to specifically one of the alleged assailants, the government argues that the past assaults did not result in "fractures, [] injuries to the soft tissues, [] no[r] damage to his sinuses or other structures," therefore, Mr. Gorbey cannot show a serious physical injury. Government Br. at 41. The government does not respond to Mr. Gorbey's allegation that prison officials coordinated these attacks.

**B.**

In the 1990s, Congress "established new standards for [] grant[ing] IFP status to prisoners, as opposed to other litigants" in response to floods of "meritless" lawsuits filed by federal prisoners proceeding IFP. *See Chandler v. D.C. Dep't of Corr.*, 145 F.3d 1355, 1356 (D.C. Cir. 1998). A few of the PLRA's unique standards are relevant here.

First, unlike other indigent persons whose filings are free, the PLRA requires indigent federal prisoners "to pay the full amount of [the] filing fees" in installments. 28 U.S.C. § 1915(b)(1)–(2). Second, under the PLRA, IFP status is limited to prisoners who have not had three "or more . . . action[s] or appeal[s] . . . dismissed . . . [as] frivolous, malicious, or [for] fail[ure] to state a claim upon which relief may be granted." 28 U.S.C. § 1915(g). After the third frivolous, malicious, or failure to state a claim dismissal, a prisoner must pay the full filing fee to proceed with a civil action or appeal, even if they are indigent. *Id.* In other words, after a prisoner receives the proverbial "third strike," all future filing fees become payable in full upfront, else the civil action

or appeal be dismissed.  *See Bruce v. Samuels*, 577 U.S. 82, 85–86 (2016).  The PLRA includes an exception:  an indigent prisoner with three strikes may nonetheless proceed IFP if "the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

Finally, the PLRA makes clear that courts should not entertain meritless actions "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid."  28 U.S.C. § 1915(e)(2).  Courts "shall dismiss the case at any time if the court determines that the allegation of poverty is untrue; or the action or appeal is frivolous or malicious; fails to state a claim on which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief."  *Id.*

## II.

The District Court had federal question jurisdiction under 28 U.S.C. § 1331, and its dismissal of Mr. Gorbey's complaint and request to proceed IFP was a final judgment.  We have jurisdiction under 28 U.S.C. § 1291 and review the District Court's dismissal *de novo*.  *Ladeairous v. Sessions*, 884 F.3d 1172, 1174 (D.C. Cir. 2018).

We use "traditional standards applicable to pleadings by *pro se* prisoners" when evaluating allegations used to establish an imminent danger of serious physical injury.  *Mitchell v. Fed. Bureau of Prisons*, 587 F.3d 415, 421 (D.C. Cir. 2009).  The "factual allegations" must be "sufficiently specific for us to infer" the "actual existence" of an imminent threat, *id.*, "both at the time [the prisoner] file[s] their lawsuit and at the time they notice their appeal," *Pinson II*, 964 F.3d at 69.  Additionally, the movant's filings must "demonstrate a nexus between the harms [] allege[d] and the claims [brought]."  *Id.* at 71.

Before we can evaluate Mr. Gorbey's allegations of imminent danger of serious physical injury, we must resolve two issues that relate to the nature of our review.

The first issue is clear from the briefing: the government argues that we can consider information that rebuts the prisoner's allegations of imminent danger, but the court-appointed *Amicus* in support of Mr. Gorbey's motion disagrees. In *Amicus*'s view, Section 1915(g) does not permit an adversarial evidentiary inquiry, in part, because appellate courts are ill-equipped to resolve the inevitable evidentiary disputes that would result from the government's rule.

We agree with the government. Even prior to the passage of the PLRA, Section 1915 was "designed largely to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suit and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Accordingly, the statute grants courts "the unusual power to pierce the veil of [a] complaint's factual allegations." *Id*. And where the veil is pierced, we must reject "factual contentions [that] are clearly baseless." *Id.* Though *Amicus* correctly notes that courts of appeal usually do not resolve factual disputes, we have already explained that "Congress can, and in the PLRA did, assign atypical roles to courts in particular circumstances." *Pinson II*, 964 F.3d at 70. Since this atypical role allows us to consider the movant's "imminent-danger allegations newly offered on appeal," it follows that we may also consider the government's rebuttals, or simply take judicial notice of relevant facts. *Id.* Indeed, it would be odd to order the government to respond to Mr. Gorbey's allegations, only to ignore the government's rebuttals—especially those

that may tend to show that Mr. Gorbey's assertions are "clearly baseless."

That said, judicial notice is not a one-way street. In this case, the government urges us to look to past cases dismissing Mr. Gorbey's IFP motions alleging similar facts. Fair enough. But that also means we can take judicial notice of government reports about the state of USP Thompson in 2022, when Mr. Gorbey alleges that USP Thompson officials placed him in imminent danger by denying him necessary medical treatment. *See* Fed. R. Evid. 201(b); Fed. R. Evid. 803(8); *see also Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (taking judicial notice of a government report).

In one such report, the Bureau of Prisons "acknowledged significant concerns with the institutional culture at USP Thompson and a lack of compliance with its own policies." OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF JUST., STATEMENT OF MICHAEL E. HOROWITZ BEFORE THE U.S. SENATE COMMITTEE ON THE JUDICIARY: EXAMINING AND PREVENTING DEATHS OF INCARCERATED INDIVIDUALS IN FEDERAL PRISONS (2024) at *3, https://perma.cc/P9AW-WDC5. Further, in June 2022, a period where Mr. Gorbey alleges that he was denied needed medical treatments, USP Thompson "had not had an on-site full time Staff Physician for over a year and nearly half of its 12 nursing positions were vacant … this led to longer wait times for inmates to receive medical attention." OFFICE OF THE INSPECTOR GENERAL, EVALUATION OF ISSUES SURROUNDING INMATE DEATHS IN FEDERAL BUREAU OF PRISONS INSTITUTIONS (2024) at *66, https://perma.cc/YST4-AEVR. In sum, notwithstanding Mr. Gorbey's past frivolous lawsuits and the past court rulings that he was not in imminent danger of serious physical injury, these government reports lend credence to his allegations regarding

USP Thompson's failure to provide necessary medical treatment for his glaucoma as of August 2022.

The second issue as to the nature of our review flies under the radar and was not briefed: When was Mr. Gorbey's appeal noticed? Though both parties advance arguments under our well-established rule that "the conditions prisoners faced at the time of noticing their appeals determine their eligibility to proceed," *Pinson II*, 964 F.3d at 69, the parties use different dates when making these arguments. The government's brief frames its case using September 20, 2022, as the relevant date because that is when we docketed the case, Government Br. at 13; however, *Amicus* states that August 30, 2022, is the relevant date because that is when Mr. Gorbey dated his filings and, we can infer, the date that Mr. Gorbey asked prison officials to send his filings to this Court, *Amicus* Reply at 20.

The date that Mr. Gorbey's appeal was noticed is critical to our disposition here because there is a factual dispute as to whether Mr. Gorbey ever saw an ophthalmologist. The government does not dispute that, as of August 30, 2022, Mr. Gorbey had not seen an ophthalmologist in eighteen months. J.A. 40–41, 116–17. But Mr. Moisant's affidavit states that Mr. Gorbey "had an external ophthalmology consult, which included detailed testing, imaging, and scans of his eyes, updates to his diagnosis, and a review of his medications" on September 1, 2022—two days after Mr. Gorbey presumably left his filings with USP Thompson officials, but nineteen days before we docketed his appeal. J.A. 103. Because Mr. Moisant's affidavit is reasonably detailed and specific it is entitled the "presumption of regularity," under which "courts presume" that public officers have "properly discharged their official duties" unless there is "clear evidence to the contrary." *United States v. Chemical Found.*, 272 U.S. 1, 14–15 (1926). Still, Mr. Gorbey asks us to accept his assertion that this

September 1, 2022, consult took place with an optometrist—not an ophthalmologist.  J.A. 40–41.

Luckily, we need not determine whose assertion carries the day.  That is because, as the parties recognize, post-filing developments exceed the scope of our Section 1915(g) inquiry with respect to whether Mr. Gorbey must pay the full filing fee to bring his complaint and notice his appeal.  *Pinson v. Samuels*, 761 F.3d 1, 5 (D.C. Cir. 2014) (*Pinson I*).  And it is well-established that we determine the date of a *pro se* prisoner's filings under the mailbox rule.  *See Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998).  Under the mailbox rule, a *pro se* prisoner's appeal is noticed on the day that the prisoner delivers their papers to prison authorities for forwarding to the court.  *Houston v. Lack*, 487 U.S. 266, 270 (1988).  Applying that rule here, Mr. Gorbey's appeal was noticed on August 30, 2022, thus all post-August 30, 2022, developments exceed the scope of our inquiry.  *See Pinson I*, 761 F.3d at 5.  (As discussed further below, we have no need to decide, and express no views on, whether the court can revoke the IFP status of a prisoner and order him to pay any subsequent fees or costs based on post-filing developments that show he is no longer in imminent danger of serious physical injury.)

It makes good sense to apply the mailbox rule in this context.  As *Houston v. Lack* explained, the mailbox rule applies to a *pro se* prisoner's filing date because they "cannot take the steps other litigants can take to monitor the processing of their notices of appeal and to ensure that the court clerk receives and stamps their notices of appeal."  487 U.S. at 270–71.  Nor do they have "lawyers who can take [the necessary] precautions for them."  *Id.* at 271.  Indeed, *pro se* prisoner litigants sit in a uniquely vulnerable position, left with "no choice but to entrust the forwarding of [their] notice of appeal

to prison authorities whom [they] cannot control or supervise and who may have every incentive to delay." *Id.*

This concern could not be more applicable to *pro se* prisoner litigants who are "[u]nskilled in law, unaided by counsel, and unable to leave prison," and seek to proceed IFP under the three-strikes exemption. *Houston*, 487 U.S. at 271. It is also consistent with how we have already construed the three-strike exemption's text—"the statute's temporal reference point [is] the initial act of bringing a lawsuit." *Pinson I*, 761 F.3d at 5. For all intents and purposes, *pro se* prisoners bring their lawsuit when they "lose control over and contact with their notices" by delivering their papers to "prison authorities." *Houston*, 487 U.S. at 275. And if ever there were a dispute as to when a *pro se* prisoner leaves their papers with prison authorities, prisons "have well-developed procedures for recording the date and time at which they receive papers for mailing and [] can readily dispute a prisoner's assertions that he delivered the paper on a different date." *Id.*

Having resolved the relevant issues bound up in our standard of review, we now turn to Mr. Gorbey's arguments that he is under imminent danger of serious physical injury.

**A.**

We start with Mr. Gorbey's argument that his worsening glaucoma places him under an imminent danger of serious physical injury. As to the sufficiency of Mr. Gorbey's filings, we find no reason to disregard the parties' agreement that Mr. Gorbey includes sufficiently specific facts allowing for an inference that he is at serious risk of losing his eyesight—a serious physical injury. We instead focus on the parties' disagreement: Does Mr. Gorbey demonstrate a nexus between the harms alleged in his filings and the claims that he brings? *Pinson II*, 964 F.3d at 71. And on this question, the parties

disagree on both the law (what is the right standard?) and the facts (are the allegations in Mr. Gorbey's filings sufficient?).

In *Pinson II*, we explained that the three-strikes exemption effectuates the PLRA's goal "to filter out the bad claims and facilitate consideration of the good . . . by imposing more onerous burdens on prisoner-litigants that have thrice been bounced from court." 964 F.3d at 71. This provision, *Pinson II* continued, "is designed to provide a *safety valve* for the three strikes rule, permitting an indigent three-strikes prisoner to proceed IFP in order to obtain a judicial remedy for an imminent danger." *Id.* (quoting *Pettus v. Morgentahu*, 554 F.3d 293, 297 (2d. Cir. 2009) (cleaned up)) (emphasis in original). Accordingly, we held that "prisoners must demonstrate a nexus between the harms they allege and the claims they bring." *Id. Pinson II* did not, however, articulate the standard that prisoner-litigants must meet to demonstrate the nexus between their alleged harms and claims brought.

Since *Pinson II*, the circuits have split on the nexus test. *Compare Pettus*, 554 F.3d at 297 *with Hall v. United States*, 44 F.4th 218, 231 (4th Cir. 2022). The government asks us to adopt the Second Circuit's test that mimics "ordinary standing rules," i.e., the prisoner-litigant's complaint must "seek to redress an imminent danger of serious physical injury and that this danger must be fairly traceable to a violation of law alleged in the complaint." *Pettus*, 554 F.3d at 297. *Amicus* counters that the Fourth Circuit's approach—requiring traceability, but not redressability—is the better test. *See Hall*, 44 F.4th at 231–32. We need not weigh in on the split because Mr. Gorbey's allegations regarding his worsening glaucoma satisfy both standards.

Under the Fourth Circuit's traceability-only test, Mr. Gorbey easily wins: his worsening glaucoma is fairly traceable

to the unrebutted allegation that he has not seen an ophthalmologist while at USP Thompson. Tellingly, the government did not offer a counterargument to Mr. Gorbey's contention that his allegations meet this test.

Under the Second Circuit's redressability standard, the government's briefing fails to respond to the crux of Mr. Gorbey's position: USP Thompson officials have not allowed him to visit an ophthalmologist even though they are well-aware of his rapidly worsening glaucoma. Instead, the government's primary argument focuses solely on Mr. Gorbey's requests to use medical marijuana to treat his worsening glaucoma. Of course, we have no authority to grant such relief. And if this were all Mr. Gorbey requested, the government would prevail. But that is not all Mr. Gorbey seeks, in fact, his requests to see an ophthalmologist are just as clear as his request for medical marijuana.[1] The government's decision to ignore this argument is quite curious.

At best, the government argues that Mr. Gorbey "does not want any of the other treatment he would be offered or that he would receive." Government Br. at 38. And for support, the government directs us to Mr. Moisant's declaration, that states Mr. Gorbey has twice rejected eye surgery, J.A. 104, as well as a 2019 court decision from the United States District Court of

---

[1] The dissent mischaracterizes Mr. Gorbey's statement that he is in imminent danger of blindness from glaucoma due to his lack of marijuana alone. Dissenting Op. at 1. Instead, Mr. Gorbey contends that the lack of treatment he has had has caused his glaucoma to progress. Motion to Stay at 11 (Sept. 15, 2023). Additionally, Mr. Gorbey has stated that he was denied glaucoma medication and access to ophthalmological care. J.A. 10; J.A. 41.

Maryland that discusses Mr. Gorbey's refusal to receive eye surgery, *Gorbey*, 2019 WL 5593284 at * 5.

This response stretches the redressability requirement too far: the question is whether the prisoner can "obtain a judicial remedy," not whether the prisoner will hypothetically accept the relief to which they are entitled. *Pettus*, 554 F.3d at 297. And the government does not dispute that Mr. Gorbey can obtain an injunction that allows him to visit with an ophthalmologist. Whether Mr. Gorbey will accept an ophthalmologist's recommendation(s) in the future is not our business. By the same token, the fact that he was uncomfortable with a surgery five years ago is similarly irrelevant.[2] What matters is, as of the date he noticed his appeal (and filed his complaint), Mr. Gorbey adequately alleges that his worsening glaucoma places him under an imminent danger of physical injury, and USP Thompson officials have not allowed him to visit an ophthalmologist.

All agree that visiting with an ophthalmologist is a legitimate request given the worsening state of Mr. Gorbey's glaucoma. Therefore, his request establishes the necessary nexus to the claims brought, and he is entitled to proceed IFP under the three-strikes exemption. Accordingly, we need not consider his arguments as to repeated prison assaults. *See, e.g., Ibrahim v. Dist. of Columbia*, 463 F.3d 3, 7 (D.C. Cir. 2006) (granting motion to proceed IFP based on one of two allegations of imminent physical injury); *see also Chavis v. Chappius*, 618 F.3d 162, 171 (2d Cir. 2010) ("Nothing in the text of § 1915 provides any justification for dividing an action

---

[2] It is not our place, particularly at the threshold stage of deciding IFP status, to opine or make factual findings on what future treatments Mr. Gorbey will accept, contrary to the dissent's belief that "marijuana [is the] 'only' remedy he will accept." Dissenting Op. at 2.

into individual claims and requiring a filing fee for those that do not relate to imminent danger.").

## B.

Even though we hold that Mr. Gorbey demonstrates an imminent danger of serious physical injury, and therefore can proceed IFP under the three-strikes exemption, our inquiry is not complete. The PLRA contemplates dismissal of "any portion of the complaint" that "is frivolous" as part of the screening function. 28 U.S.C. § 1915A(b)(1); *see also Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). And just as we are attuned to Mr. Gorbey's allegations that the continued denials of medical treatment for his worsening glaucoma place him under an imminent threat of serious physical injury, we recognize that Mr. Gorbey's complaint includes far-fetched allegations that must be forcefully rejected.

Specifically, Mr. Gorbey alleges that federal judges, the Senate Judiciary Committee, and the President and Vice President are all in cahoots to prevent him from filing lawsuits. One judge, Mr. Gorbey's filings state, rejected his motion to proceed IFP under the three-strikes exception and, in so doing, insinuated that he has no access to court, ever. J.A. 16. Mr. Gorbey describes two other courts, that also denied his IFP motions, as "hostile" "clown houses posing as court houses." J.A. 20. And while "Cho-mo-Joe Biden" and "C. Harris President and Vice President from stolen elections" are not listed as defendants, Mr. Gorbey alleges that they are also in on the plot. J.A. 21.

These allegations are clearly frivolous. Therefore, we dismiss Mr. Gorbey's claims against the United States Attorney General, the Director of the Administrative Office of Federal Courts, and the United States Senate Judiciary

Committee. Mr. Gorbey's allegations of their concerted effort to abridge his right to access federal courts are "clearly baseless." *Neitzke*, 490 U.S. at 327.

### III.

In closing, we want to make the limitations of our holding clear. Mr. Gorbey is entitled to "*bring* a civil action or appeal a judgment" IFP because he "is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g) (emphasis added). This action is limited to the claims against Captain Avery and the Director of the Federal Bureau of Prisons. In most plain terms, this means that Mr. Gorbey's complaint will be docketed, and he can pay his filing costs in installments. 28 U.S.C. § 1915(b).

But we express no views on whether proceeding IFP under the three strikes exemption can be revoked if circumstances change as the prisoner *maintains* their action. Section 1915(g)'s text and our holdings make clear that an indigent prisoner who is in imminent danger at the time of filing may bring their action or appeal and pay the filing fee in installments. *Pinson I*, 761 F.3d at 5 (Section 1915(g) is "a mere screening device" to determine whether the prisoner is under imminent danger "when he brings his action.") (cleaned up). However, the granting of IFP status confers additional benefits after the prisoner makes his initial installment payment towards the filing fee, including appointment of counsel at the court's discretion and the printing of the record, printing of transcripts, and service of process at government expense. *See* 28 U.S.C. § 1915(c)–(d); *see also Rowland v. Cal. Men's Colony*, 506 U.S. 194, 198 (1993).

Therefore, we leave open an important question that the government raised in its briefing: Are courts free to revoke IFP status, initially granted on being placed under an imminent

threat of serious physical injury, if circumstances change? *See* Government Br. at 27–28. Asked differently, does Section 1915(g) cover the entire proceeding based on the initial imminent danger finding or does it simply ensure that the prisoner who is under an imminent danger is not blocked at the courthouse's doors? Our circuit case law does not provide a clear answer.

On one hand, we have recognized that courts have "discretionary authority to deny IFP status to prisoners" under the PLRA and "our more general supervisory authority to manage our docket so as to promote the interests of justice." *Butler v. Dep't of Just.*, 492 F.3d 440, 445 (D.C. Cir. 2007). And, as a matter of procedure, district courts in our circuit and elsewhere have consistently revoked previously granted IFP status upon learning new information about the financial status of the parties as the case unfolds. *See Matthews v. Fed. Bureau of Investigation*, 251 F. Supp. 3d 257, 264 (D.D.C. 2017) (collecting cases); *Cf. Carter v. Telectron, Inc.*, 752 F. Supp. 939 (S.D. Tex. 1976) (revoking a previous motion granting IFP after a change in financial circumstances in the non-prisoner context).

On the other hand, we have recognized that the three-strikes exemption plays an important role in easing "any constitutional tension that might result from denying access to the courts to prisoners facing life-threatening conditions." *Mitchell*, 587 F.3d at 420. In some cases, revoking IFP status could result in the dismissal of a case brought to vindicate a fundamental constitutional right; in such a case, there would be a question whether the dismissal unconstitutionally restricts the indigent prisoner's right to access the courts. *See Thomas v. Holder*, 750 F.3d 899, 909 (D.C. Cir. 2014) (Tatel, J., concurring).

We have no reason to answer this complicated question here as Mr. Gorbey's IFP status was never revoked. We simply recognize that the issue may need to be addressed in the future and provide notice to the parties of a few difficult questions that ought to be considered.

*So ordered.*

WALKER, *Circuit Judge*, concurring in part and dissenting in part:

Michael Gorbey is a federal prisoner. The government provides him with extensive medical care.[1] In the past, it has also offered Gorbey additional care that he refused.[2]

Gorbey has filed "scores" of lawsuits from prison.[3] His "abusive litigating methods display a complete disregard for court decorum" and a "commitment to frivolously filing cases."[4] Because of that history, Gorbey must pay the court's full filing costs up front, unless he "is under imminent danger of serious physical injury."[5] The district court decided that Gorbey does not qualify for that "imminent danger" exception.

On appeal, Gorbey alleges that he is in "imminent danger" of blindness from glaucoma because his prison won't let him smoke marijuana.[6] Before his incarceration, he "smoke[d]

---

[1] *See* JA 107 ("Between May 9 and December 8, 2022, Gorbey's electronic medical records show no less than 20 discrete clinical encounters, which show regular treatment for glaucoma" and other ailments.).

[2] *See Gorbey v. Mubarek*, No. 19-220, 2019 WL 5593284, at \*3-5 (D. Md. Oct. 30, 2019); *see also* JA 72 (Gorbey's doctor: "I fear that Inmate Gorbey's past actions regarding his eye care have profoundly contributed to this poor prognosis.").

[3] *See Pinson v. United States Department of Justice*, 964 F.3d 65, 72 (D.C. Cir. 2020).

[4] *Gorbey v. United States*, No. 22-50330, 2022 WL 22298309, at \*2 (N.D. Ill. Nov. 28, 2022).

[5] 28 U.S.C. § 1915(g); *see also Pinson*, 964 F.3d at 72.

[6] *See Pinson*, 964 F.3d at 71 (Because "an indigent prisoner with a history of filing frivolous complaints could, by merely alleging an imminent danger, file an unlimited number of lawsuits, paying no filing fee," prisoners must show "a nexus between the harms they

marijuana all his life."[7]  During that time, according to Gorbey, "his eyes became dependent on marijuana."[8]

In his filings, Gorbey repeatedly and emphatically attributes his declining eyesight to the interruption of his marijuana habit, while insisting that the government must provide him with marijuana — the "only" remedy he will accept:[9]

- Gorbey wrote on his medical records that he "*need[s] medical marijuana*" because surgery "fail[ed]" and "pills & eye drops" have "not help[ed]."[10]

- Gorbey says "now *only* medical marijuana is safe & effective for Gorbey to use while eye drops & pills don't help him & only cause other" medical problems.[11]

- Gorbey says when he was "deprived of marijuana it *(caused)* him to develop glaucoma."[12]

- Gorbey says the "progressing extensive damages to both of [his] eyes" are "*due to* denials of marijuana."[13]

---

allege and the claims they bring" to proceed in forma pauperis under the imminent danger exception.  (cleaned up)).

[7] Motion to Stay at 12 (Sept. 15, 2023).

[8] *Id.*

[9] *Id.* at 11.

[10] Response to Show Cause Order at 43 (Dec. 13, 2022) (emphasis in original).

[11] Motion to Stay at 11 (Sept. 15, 2023) (emphasis added).

[12] *Id.* at 12 (parenthetical in original) (emphasis added).

[13] *Id.* at 20 (emphasis added).

- Gorbey says that when he was "deprived of marijuana . . . he develope[d] glaucoma *as a result*."[14]

- Gorbey argues he satisfies the imminent danger exception because of his "advancing glaucoma & [his] single personal medical (*need*) for marijuana!"[15]

- Gorbey repeatedly writes "*because* I'm den[ied] marijuana" on medical records showing his worsening glaucoma.[16]

- Gorbey describes himself as "*not* a good surgical candidate" and self prescribes a "*need* [for] medical marijuana."[17]

Those claims are frivolous. Medical professionals say that marijuana is not an effective treatment for glaucoma.[18] Plus, "we have no authority to grant such relief."[19] So Gorbey has not shown the required "nexus between the harms [he] allege[s]

---

[14] Appellant Br. at 3 (Sept. 26, 2023) (emphasis added).

[15] *Id.* at 11 (parenthetical in original) (emphasis added).

[16] Gorbey Pro Se Appendix at 1, 2, 5 (Sept. 27, 2023) (emphasis added).

[17] Gorbey Pro Se 28j Letter at 1 (June 3, 2024) (first emphasis in original, second emphasis added).

[18] *See* David Turbert & Dan Gudgel, *Does Marijuana Help Treat Glaucoma or Other Eye Conditions*, American Academy of Ophthalmology (Dec. 13, 2023), https://perma.cc/D697-Y7JD; Kathryn E. Bollinger, M.D. & Kevin M. Halenda, M.D., *Should You Be Using Marijuana to Treat Your Glaucoma*, Glaucoma Research Foundation (Jan. 10, 2019), https://perma.cc/Q9JC-WX5Y; Henry Jampel, M.D., M.H.S., *Position Statement on Marijuana and the Treatment of Glaucoma*, American Glaucoma Society (Aug. 10, 2009), https://perma.cc/4ANB-XSUK.

[19] Majority Op. at 15.

and the claims [he] bring[s]."[20]  He has not plausibly alleged the *cause* of an imminent danger;[21] nor has he sought "to *redress* an imminent danger . . . fairly traceable to a violation of law."[22]

The majority agrees that "Gorbey believes that he now needs medical marijuana."[23]  And it agrees that if marijuana is "all Mr. Gorbey requested, the government would prevail."[24]  But according to the majority, "that is not all Mr. Gorbey seeks."[25]

I respectfully disagree.  Gorbey provides little reason to believe he blames his worsening glaucoma on anything other than the absence of marijuana, nor is he willing to accept anything but what he calls the "only . . . safe & effective" treatment.[26]  I would take Gorbey at his word, buttressed by his refusal to accept the corrective surgery that has already been recommended "twice."[27]  Though Gorbey now "requests to see

---

[20] *Pinson*, 964 F.3d at 71.

[21] *See* Majority Op. at 14 (the Fourth Circuit's nexus test requires "traceability, but not redressability").

[22] *See id.* (quoting without adopting the Second Circuit's nexus test) (emphasis added).

I agree with the majority that we "need not weigh in on the split" between the Second and Fourth Circuits.  *Id.*

[23] *Id.* at 4 (citing JA 75).

[24] *Id.* at 15.

[25] *Id.*; *see also id.* at 6 (majority stating marijuana is not "the only treatment that Mr. Gorbey will accept").

[26] Motion to Stay at 11 (Sept. 15, 2023); *see also infra* pp. 2-3.

[27] JA 104 ("Gorbey twice declined eye surgery in 2019 to address his worsening glaucoma").

an ophthalmologist" *again*,[28] he is not seeking an ophthalmologist to provide ophthalmology care — he is seeking an ophthalmologist "only" to provide marijuana.[29]

Therefore, I respectfully dissent from the majority's decision allowing Gorbey to proceed without the full payment of his filing fee.[30]

---

[28] Majority Op. at 15.

[29] Motion to Stay at 11 (Sept. 15, 2023); *see, e.g.*, Gorbey Pro Se 28j Letter at 1 (June 3, 2024) (Gorbey reiterating in his most recent filing that he believes he is "*not* a good surgical candidate" so he "need[s] medical marijuana" (emphasis in original)).

Even if a few of Gorbey's (many) filings contradict the very basis of Gorbey's suit — that the denial of marijuana is his condition's only cause, and marijuana is the only acceptable remedy — it seems curious to reward Gorbey for his filings' internal inconsistencies. *Cf.* Appellant Reply Br. at 13 ("[T]his entire litigation is not to just obtain weed!"). If anything, those inconsistencies just undermine his credibility. After all, if "we can consider information that rebuts the prisoner's allegations of imminent danger" when it is offered by the government — and I agree with the majority that we can — then we can also consider statements by the prisoner that rebut his own claims. Majority Op. at 9.

[30] I concur with the majority's decision to dismiss Gorbey's claims "that federal judges, the Senate Judiciary Committee, and the President and Vice President are all in cahoots to prevent him from filing lawsuits." Majority Op. at 17.